**Tara HOTT, Plaintiff,**

v.

**VDO YAZAKI CORPORATION, et al., Defendants.**

**Civil A. No. 94–00064–H.**

United States District Court, W.D. Virginia, Harrisonburg Division.

April 2, 1996.

Marilyn Ann Solomon, Winchester, VA and Annette Kay Rubin, Martin & Rubin, Leesburg, VA, for plaintiff.

Steven W. Ray and Jason M. Branciforte, Kruchko & Fries, McLean, VA, for defendants.

## MEMORANDUM OPINION

MICHAEL, District Judge.

This matter comes before the court upon the defendants' respective motions for summary judgment as to all counts. In her "Motion for Judgment,"[1] the plaintiff alleges the following:

1. The plaintiff initially filed this civil action in state court in the Commonwealth of Virginia,

Count I: A claim of violation of Title VII of the so-called Civil Rights Act of 1991 against the defendant VDO Yazaki Corporation ("VDO")[2] on the ground of sexual harassment. The plaintiff alleges both "condition of work" sexual harassment and *"quid pro quo"* sexual harassment.

Count II: A claim of common law battery against both defendants.

Count III: A claim of wrongful discharge against the defendant VDO based both upon the ground of a violation of the so-called Family Medical Leave Act ("FMLA") and upon the ground of sexual harassment.[3]

Count IV: A claim of negligent hiring, negligent retention, and negligent supervision against the defendant VDO.[4]

On September 6, 1995, the Honorable B. Waugh Crigler, United States Magistrate Judge, filed his "Report and Recommendation."[5] In his Report, the Magistrate Judge recommends that the court overrule the defendants' motions for summary judgment as to Counts I and II, and grant the defendant VDO's motion for summary judgment as to Counts III and IV. The parties filed objections, pursuant to Federal Rule of Civil Procedure 72(b), and on January 29, 1996, this

court heard oral argument on the objections. The court has undertaken a *de novo* review of the record in this matter, pursuant to *Orpiano v. Johnson,* 687 F.2d 44 (4th Cir. 1982). For the reasons stated below, the court adopts the Magistrate Judge's "Report and Recommendation" inasmuch as it recommends that the court overrule the defendants' motions for summary judgment as to Counts I and II and that the court grant the defendant VDO's motion for summary judgment as to Counts III and IV.

*I.*

The plaintiff, Tara Hott, was employed by the defendant VDO Yazaki Corporation ("VDO"), a company with a facility located in Winchester, Va. The defendant Juergen Nies ("Nies") is a Production Manager employed by VDO. On August 25, 1989, VDO hired the plaintiff as a Temporary Assembler in its Production Department. The plaintiff's temporary position lasted eleven weeks.[6]

In August 1990, VDO hired the plaintiff on a permanent basis. VDO assigned the plaintiff to the warehouse and, shortly thereafter, transferred the plaintiff to the Production Department. Bill Simpson supervised the plaintiff.

and the matter was removed to this court. In Virginia, a civil action at law is initiated by the filing of a "Motion for Judgment."

2. On March 10, 1995, the court dismissed the action against the defendant Juergen Nies as to Count I.

3. In his Report and Recommendation, the Magistrate Judge recommends that the court deny the plaintiff's request to address Count III upon any basis other than upon the basis of a violation of the FMLA. It appears to the court that the plaintiff marginally, at least, pleaded wrongful discharge upon the ground of sexual harassment in her "Motion for Judgment" and that the defendant VDO addressed the claim in its memorandum in support of its motion for summary judgment. Perhaps the technical solution would be to refer the matter back to the Magistrate Judge for a recommendation on the wrongful discharge claim based upon sexual harassment; however, the court believes that the issue is sufficiently developed to permit the court to dispose of it at this point in the proceedings. Consequently, the court will decline to adopt the Magistrate Judge's recommendation that the court limit its consideration of Count III to the alleged

violation of the FMLA and will consider the sexual harassment component to the claim of wrongful discharge.

4. The parties have stipulated that Counts III and IV are not applicable to the defendant Juergen Nies.

5. By Standing Order issued June 26, 1992, this court referred all civil actions to the United States Magistrate Judge for appropriate pre-trial matters and for conclusions of fact and recommendations for the disposition of dispositive matters, pursuant to 28 U.S.C. §§ 636(b)(1)(A) & (B).

6. The defendant claims that the plaintiff's supervisor completed a job performance evaluation *after* the plaintiff was discharged from her temporary position. The plaintiff argues that the defendant caused the form to be completed for purposes of the instant litigation and notes that the form does not contain the plaintiff's signature. The court, however, declines to address this issue because the issue seems largely irrelevant to the material issues at hand—namely, the treatment of the plaintiff after she was hired on a permanent basis.

On June 28, 1991, VDO transferred the plaintiff to the Purchasing Department, where the plaintiff worked as a Data Entry Clerk. Sue Saxion supervised the plaintiff in this position.

On March 12, 1992, VDO transferred the plaintiff back to the Production Department where she was supervised by Angie Pitta. VDO alleges that it was at this point that the plaintiff entered the company's so-called "corrective action program." The corrective action program functioned to address chronic absenteeism by employees. After a number of unexcused absences, an employee would enter Phase I, whereby the employee was monitored for continued absenteeism and tardiness. If absenteeism and tardiness continued, the employee would enter Phase II, where the requirements became more stringent. Again, if absenteeism and tardiness continued, the employee entered Phase III. If the employee failed to satisfy the requirements of Phase III, the employee would be terminated. If at any stage an employee satisfied the requirement of the then-applicable Phase, then the employee would ultimately exit the program. The plaintiff had progressed through the corrective action program and was in Phase III when she went on disability leave in January 1994.

The plaintiff remained on disability leave until February 28, 1994. When the plaintiff returned to work from her leave, VDO continued to monitor the plaintiff's absenteeism and tardiness under the requirements of Phase III. VDO informed the plaintiff that she could not be absent from work unless there was a death in her family, unless VDO initiated a shutdown, or unless the plaintiff was called to jury duty. On March 2, 1994, the plaintiff left her work station and notified her group leader that she was leaving work. The plaintiff provided VDO with a "Family and Medical Leave Certification Form," which the plaintiff claims excused her from work on March 2, 1994. Thereafter, a group of VDO management and supervisory personnel met to discuss the plaintiff's history of absenteeism. After one member of the group contacted the Department of Labor concerning the FMLA Certification Form, the group decided to terminate the plaintiff's

employment. VDO terminated the plaintiff's employment on March 8, 1994. This action ensued.

## II.

### Summary Judgment Principles

Summary judgment is appropriate when there is no genuine dispute of material fact and when the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). " 'As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.' " *Doyle v. Sentry Ins.*, 877 F.Supp. 1002, 1005 (E.D.Va. 1995) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510). " 'Genuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice.' " *Id.* (quoting *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir.1985)). In determining whether genuine and material factual disputes exist, resolution of which would require trial, the court should review the parties' respective memoranda and the many exhibits attached thereto, construing all facts, and all reasonable inferences drawn therefrom, in the light most favorable to the plaintiff. *Riley v. Technical & Management Servs. Corp.*, 872 F.Supp. 1454, 1459 (D.Md. 1995) (citing *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)). The summary judgment inquiry scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient evidence, in the form of admissible evidence, that could carry the burden of proof at trial. *Mitchell v. Data General Corp.*, 12 F.3d 1310, 1316 (4th Cir.1993). "Courts must take special care in considering summary judgment in cases involving questions of motive, such as in employment discrimination cases." *Doyle*, 877 F.Supp. at 1005. With these principles in mind, the court begins this odyssey.

**1120**

### A. Count I—Title VII

Title VII of the so-called Civil Rights Act of 1991 provides in relevant part that "[i]t shall be an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's ... sex." 42 U.S.C. § 2000e–2(a)(1) (1994). In *Katz v. Dole*, 709 F.2d 251, 254 (4th Cir.1983), the court recognized two distinct varieties of sexual harassment: " 'harassment that creates an offensive environment ('condition of work') [7] and harassment in which a supervisor demands sexual consideration in exchange for job benefits ('quid pro quo').' " *Id.* (quoting *Henson v. City of Dundee*, 682 F.2d 897, 908 n. 18 (11th Cir.1982)). Because the plaintiff appears to allege both forms of sexual harassment, the court will address these forms separately.[8]

#### 1. 'Condition of Work' Harassment

■ "Sexual harassment based on a hostile work environment exists where there are sexual advances, fondling or a sexually suggestive workplace atmosphere that the claimant finds unwelcome." *Walker v. Sullair Corp.*, 736 F.Supp. 94, 100 (W.D.N.C.1990). "Hostile work environment is characterized by a workplace 'pervaded with sexual slur, insult and innuendo, ... verbal sexual harassment, ... or extremely vulgar and offensive sexually related epithets' directed to or about an employee." *Id.* (quoting *Katz*, 709 F.2d at 254). In *Katz*, the court established a two-part analysis for determining "condition of work" sexual harassment: "First, the plaintiff must make a *prima facie* showing that sexually harassing actions took place, and if this is done, the employer may rebut the showing either directly, by proving that the events did not take place, or indirectly, by showing that they were isolated or genuinely trivial. Second, the plaintiff must show that the employer knew or should have

known of the harassment, and took no effectual action to correct the situation." *Katz*, 709 F.2d at 256. "To prove such a claim, the plaintiff must show that the conduct in question was unwelcome, that the harassment was based on sex, and that the harassment was sufficiently severe or pervasive to create an abusive working environment." *Swentek v. USAIR, Inc.*, 830 F.2d 552, 557 (4th Cir. 1987) (citing *Henson*, 682 F.2d at 903–04); *see also Hammill v. Albemarle County Sch. Bd.*, Civ. Action No. 93–00031–C, 1994 WL 147753 (W.D.Va. Apr. 18, 1994). "The plaintiff also must show some basis for imposing liability on the employer." *Swentek*, 830 F.2d at 557; *see also Hammill*, at * 3–4. "[T]he standard for determining that sexual harassment constitutes a hostile environment, 'is not, and cannot by its nature be, a mathematically precise test,' and so the boundary of what is actionable is unclear." *Spicer v. Commonwealth*, 44 F.3d 218, 225 (4th Cir.1995) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, ——, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993)).

#### (a) The Prima Facie Showing

■ "In cases involving claims of sexual harassment, ... sexual advance or insult almost always will represent 'an intentional assault on an individual's innermost privacy.' " *Id.* at 255 (quoting *Bundy v. Jackson*, 641 F.2d 934, 945 (D.C.Cir.1981)). In *Walker*, the court concluded that a claimant did not prove her case of sexual harassment based upon a hostile working environment because the plaintiff offered no proof that she was subjected to "unwelcome touching or fondling" or that the workplace was "pervaded with sexual slur, insult and innuendo." *Walker*, 736 F.Supp. at 100. Such is not the case in the instant action. The plaintiff in the instant action proffers an array of evidence both of unwelcome touching or fondling and of a workplace pervaded with sexual slur.[9]

"Plaintiff was subject to *quid pro quo* sexual harassment by defendants in violation of the provisions of Title VII."

---

7. Also known as "hostile work environment."

8. In Paragraph 18 of her "Motion for Judgment," the plaintiff alleges that "Plaintiff was forced to work in a sexually hostile working environment in violation of the provisions of Title VII." In Paragraph 19, the plaintiff alleges that

9. On February 15, 1995, the parties entered into, and the Magistrate Judge approved, a stipulated protective order designating discovery materi-

The defendant's only substantial defense to these claims is that the plaintiff relies upon hearsay evidence that will not be admissible at trial. In *Mitchell v. Data General Corp.,* 12 F.3d 1310, 1316 (4th Cir.1993), the court stated the court should "scrutinize[ ] the plaintiff's case to determine whether the plaintiff has proffered sufficient proof, in the form of admissible evidence, that could carry the burden of proof of his claim at trial." *See also Wilder v. Southeastern Public Serv. Auth.,* 869 F.Supp. 409, 416 (E.D.Va.1994) (holding that the plaintiff's reliance solely upon one statement which was hearsay not within any exception and therefore inadmissible was not sufficient to oppose a summary judgment motion). The *Wilder* case is distinguishable from the instant action because in *Wilder* the plaintiff's conclusion was based upon a single statement. In the instant action, however, the plaintiff's conclusion is based both upon some hearsay evidence that will not be admissible at trial and upon some direct evidence that will be admissible. The court concludes that sufficient evidence exists from which a fact finder could reasonably conclude, from the perspective of both the plaintiff and the reasonable person, that the supervisors' alleged conduct toward the plaintiff was based upon sex and that it created a hostile atmosphere by altering the conditions under which the plaintiff had to work. *See Hammill,* at * 6. Consequently, the court concludes that the plaintiff has proffered evidence sufficient to demonstrate a *prima facie* showing of "condition of work" sexual harassment.

### (b) VDO's Knowledge of the Sexual Harassment

█ In a "condition of work" sexual harassment case, "the plaintiff must demonstrate that the employer had actual or constructive knowledge of the existence of a sexually hostile working environment and took no prompt and adequate remedial action." *Katz,* 709 F.2d at 255 (citing *Henson,* 682 F.2d at 905); *Bundy,* 641 F.2d at 943; 29 C.F.R. § 1604.11(d)). In *Katz,* the court stated that "to avoid liability under Title VII, an employer on notice of sexual harass-

ment must do more than indicate the existence of an official policy against such harassment." *Katz,* 709 F.2d at 256. In the instant action, the plaintiff has presented evidence that VDO's management and supervisory personnel had knowledge of the alleged sexual harassment and refused to apply corrective measures. The plaintiff purportedly filed a complaint with Sue Saxion concerning the alleged harassment by one supervisor. The plaintiff claims that she reported the incidents concerning two supervisors to the Human Resources Department, specifically, Debbie Sieber. The plaintiff transferred out of one department and back into the production department because she needed to get away from the alleged harassing conduct. The plaintiff requested a transfer out of another department, but her request was denied. The plaintiff claims that evidence exists to show that VDO management did nothing to quell the rumors that VDO employees received promotions after engaging in sexual relationships with members of management. VDO, on the other hand, does not present evidence concerning its response to the plaintiff's alleged complaints. The court concludes that the plaintiff has presented a genuine issue as to whether VDO had knowledge of the sexual harassment and, accordingly, will deny the defendant VDO's motion for summary judgment on the plaintiff's claim of "condition of work" sexual harassment.

### 2. "Quid Pro Quo" Harassment

█ A plaintiff can establish a presumption of *quid pro quo* sexual harassment by demonstrating a five-element *prima facie* case:

1. The employee belongs to a protected group;

2. The employee was subject to unwelcome sexual harassment;

3. The harassment complained of was based upon sex;

4. The employee's reaction to the harassment affected tangible aspects of the employee's compensation, terms, con-

---

als—documents and information—as confidential. In accordance with said protective order,

the court will refer to the evidence in general terms only.

ditions, or privileges of employment. The acceptance or rejection of the harassment must be an express or implied condition to the receipt of a job benefit or cause of a tangible job detriment to create liability. Further, as in typical disparate treatment cases, the employee must prove that she was deprived of a job benefit which she was otherwise qualified to receive because of the employer's use of a prohibited criterion in making the employment decision.

5. The employer, as defined by Title VII, 42 U.S.C. § 2000(e)(b), knew or should have known of the harassment and took no effective remedial action.

*Spencer v. General Electric, Co.*, 894 F.2d 651, 658 (4th Cir.1990). Once a plaintiff makes out the *prima facie* case, "an inference that *quid pro quo* sexual harassment has occurred arises and the burden of production shifts to the defendant to rebut the presumption with legitimate, nondiscriminatory reasons for the employment decision in question." *Id.* at 659 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253–54, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981)). "If the presumption is rebutted, the burden of production returns to the plaintiff to show that the defendant's proffered nondiscriminatory reasons are pretextual and that the employment decision was based on a sexually-discriminatory criterion." *Id.* (citing *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095).

### (a) The Prima Facie Showing

1. Clearly, the plaintiff is a member of a protected group.

2. The court concludes that the plaintiff has presented evidence sufficient to demonstrate that the she was subject to unwelcome sexual harassment. (*See II, A. Count I— Title VII, 1. "Condition of Work" Sexual*

*Harassment; (a) The* Prima Facie *Showing, supra* ).

3. Clearly, the harassment of which the plaintiff has complained was based upon her sex as a woman. The harassment must be "of a sexual origin." *Walker*, 736 F.Supp. at 99. In other words, the alleged harassment experienced by the plaintiff must stem from the fact that she is a woman and must be harassment not suffered by similarly-situated men.[10] One supervisor continued to make sexually suggestive comments about the plaintiff's appearance while touching the plaintiff on the shoulders and on the back. Another supervisor "made obscene comments to her, touched her, followed her, called her, asked her out, proposed marriage to her although she was already married, and commented on her looks, body and breasts." (Plaintiff's Statement of Material Facts Taking Issue With Defendants' Statement of Material Facts, p. 3). There is no evidence that these same supervisors engaged in such behavior with men similarly-situated to the plaintiff. Therefore, the court concludes that the harassment was based upon the plaintiff's sex as a woman.

4. Taking all inferences in favor of the plaintiff, the court finds that the plaintiff survives this element of the standard. There must be "some connection between the sexual conduct and some economic benefit or detriment" to establish a case of *quid pro quo* sexual harassment. *Walker*, 736 F.Supp. at 100 (citing *Spencer*, 894 F.2d at 658). In *Spencer*, the court found that element four was satisfied where the claimant produced evidence that another female employee who succumbed to sexual demands received a promotion and where the claimant sought a promotion, refused sexual demands, and the job remained unfilled. *Spencer*, 894 F.2d at 659. In the instant case, the plaintiff claims that during one conversation one supervisor asked the plaintiff out on a date and offered her a job where she could have an hour for lunch. The plaintiff interpreted this statement as meaning that *if* she wanted the

---

10. In *Walker*, the court concluded that the harassment was not of a sexual origin where the evidence demonstrated that a male employee was harassed as much as the female plaintiff. The evidence suggested that the supervisor treated "both male and female employees with contempt." *Id.*

extended lunch break *then* she should accept the supervisor's offer for a date. Apparently, the plaintiff did not accept the supervisor's offer for a date and, consequently, never received the extended lunch break. The plaintiff claims also that after she repeatedly refused the supervisor's offers for a date, she then began to experience "adverse employment actions" that resulted in her termination. The plaintiff claims that her requests for vacation and emergency leave were repeatedly denied; that physician notes limiting her overtime working schedule were ignored; and that she was placed on Phases I, II and III, and "special probation." The plaintiff claims that other employees who missed more work than she were not similarly placed into Phases I, II, and III, and "special probation." Indeed, the plaintiff claims that no other employee had previously been placed on "special probation." The plaintiff claims that she suffered each adverse employment action at the supervisor's command. Finally, the plaintiff claims that other female employees received promotions after they dated or purportedly had sexual relationships with supervisors.

■■■ VDO responds that the plaintiff cannot demonstrate the requisite nexus between her refusal of the alleged advances and the plaintiff's termination. VDO argues that almost two years passed between the last alleged sexual advance in December 1992 and the plaintiff's termination in March 1994. In cases concerning retaliatory discharge, courts "have concluded that the discharge of an employee soon after the employee engages in protected activity is strongly suggestive of retaliatory motive and thus indirect proof of causation." *Carter v. Ball*, 33 F.3d 450, 459 (4th Cir.1994) (citing *Oliver v. Digital Equip. Corp.*, 846 F.2d 103, 110 (1st Cir.1988)). In *Carter*, the court found a causal connection where the temporal proximity between protected activity and discharge was four months. *See also Muehlhausen v. Bath Iron Works*, 811 F.Supp. 15, 20 (D.Me.1993) (six months). On the other hand, courts have found no causal connection where the temporal proximity is of a longer duration. *See Oliver*, 846 F.2d at 110–11 (no inference of retaliation where discharge occurred thirty-three months after the EEOC claim); *Samuelson v. Durkee/French/Airwick*, 976 F.2d 1111 (7th Cir.1992) (the passing of three years between a charge of discrimination and the subsequent termination "discount[ed] the causal connection between the two events"); *Jennings v. Uniroyal Plastics Co.*, 1989 WL 125601, * 8 (N.D.Ind. Jan. 25, 1989) (No causal link could be inferred from an interval of two years between the filing of an EEOC claim and her adverse employment activity.). In the instant action, the determinative question is whether the fifteen month period falls on the side of the line suggesting a causal connection, and that question should be answered by a jury.

■■■ Moreover, the court disagrees with VDO's attempt to limit the relevant consideration only to the plaintiff's termination. The court notes that the plain language of § 2000e–2(a)(1) speaks in terms of "compensation, terms, conditions, or privileges of employment." Thus, a Title VII claim requires the court to consider a broad spectrum of circumstances to determine whether the plaintiff's "conditions" or "privileges" of employment were affected by the alleged sexual harassment. Accordingly, while VDO considers the relevant period as that falling between the last advance and the plaintiff's termination, the more appropriate period is that between the last advance and the plaintiff's re-entry into Phase I of the corrective action program on December 21, 1992.[11]

---

11. The plaintiff's re-entry into this program is significant because the plaintiff claims that there exists no company policy whereby an employee moves from Phase II and back into Phase I. The plaintiff claims that an employee either satisfies the requirements of Phase II and exists the corrective action program or fails to satisfy the requirements and enters into Phase III. If the plaintiff satisfied the requirements of Phase II, then the plaintiff should have exited the program. If the plaintiff satisfied the requirements of Phase II and yet was re-entered into Phase I, then such action suggests an unusual progression that may be retaliatory for her refusing the sexual advances made in the same month. This action is suspicious because the Phase II six month period was scheduled to expire on January 17, 1993—after the plaintiff re-entered Phase I.

VDO does not adequately address the plaintiff's claim that other female employees received promotions after dating supervisors. In *Spencer,* the court noted that the claimant "produced evidence that another female employee who worked under [the supervisor], and who succumbed to his sexual desires, received larger pay increases than [the claimant] received." *Spencer,* 894 F.2d at 659. The *Spencer* court found that this evidence supported the existence of element four.

Likewise, VDO does not adequately address the plaintiff's claim that the plaintiff was offered the possibility of an extended lunch break in exchange for her acquiescing to the sexual advances. VDO does not address the plaintiff's claim that she was denied vacation and emergency leave. A grant of summary judgment in favor of VDO would be improper where the evidence suggests the existence of undisputed material facts favoring the plaintiff.

■■■ 5. VDO knew or should have known of the harassment and took no remedial action. In *Spencer,* the court noted that "where the sexual harassment is being committed by one of the employer's supervisors, this element is automatically met because under 42 U.S.C. § 2000e(b) knowledge of the harassment is imputed to the employer through its agent-supervisor." *Spencer,* 894 F.2d at 658 n. 10. *See also Martin v. Cavalier Hotel Corp.,* 48 F.3d 1343, 1351 n. 3 (4th Cir.1995) ("[I]n *quid pro quo* sexual harassment cases an employer is automatically liable for its supervisor's conduct."); *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 72, 106 S.Ct. 2399, 2408, 91 L.Ed.2d 49 (1986) (Congress intended that courts look to agency principles for guidance on the issue of employer liability under Title VII.); *see generally* Restatement (Second) Agency §§ 219–237 (1958). Thus, in the instant case, the alleged harassment is imputed to VDO because the harassment was allegedly committed by one of its supervisors—a Production Manager.

### (b) VDO's Legitimate Nondiscriminatory Reasons

■■■ *Assuming arguendo* that the plaintiff has established a *prima facie* case of "*quid pro quo*" sexual harassment, VDO may rebut the presumption by demonstrating that there were legitimate nondiscriminatory business reasons for the adverse employment actions. In the present case, VDO claims that the plaintiff was terminated because of an unacceptable number of absences. VDO proffers the following evidence: In 1990, the plaintiff received a verbal reprimand for excessive absenteeism (Hott Performance Appraisal). In January 1991, the plaintiff received a written reprimand for an excessive number of absences in the preceding three-month period. (Hott Attendance Reprimand). In February 1992, the plaintiff received another written reprimand for unexcused absences. (Hott Reprimand Report). On April 30, 1992, the plaintiff was placed into Phase I of VDO's corrective action program. On July 20, 1992, the plaintiff moved into Phase II of the program. On December 21, 1992, VDO returned the plaintiff to Phase I of the program. In May 1993, the plaintiff returned to Phase II of the program. On August 4, 1993, the plaintiff entered into Phase III of the program.

During the period in which the plaintiff's Phase III status was extended due to the plaintiff's disability leave,[12] VDO informed the plaintiff that she could not be absent from work unless there was a death in her family, unless VDO initiated a shutdown, or unless the plaintiff was called to jury duty. On March 2, 1994, the plaintiff left her work station and informed her group leader that she was leaving work.[13] The plaintiff left work. On that same day, a group of VDO supervisory and management personnel met to discuss the plaintiff's history of unexcused absences. On March 7, 1994, the group decided to terminate the plaintiff's employment, and on March 8, 1995, the plaintiff's employment was terminated. Clearly, exces-

---

12. As mentioned *supra,* the plaintiff calls this period "special probation" and argues that it was unique to the plaintiff and that it operated to impose unusually harsh restrictions upon her.

13. The parties seem to disagree about whether the group leader had the authority to permit the plaintiff to leave. The court, however, finds this dispute to be immaterial.

sive absenteeism constitutes a legitimate nondiscriminatory business reason for VDO's terminating the plaintiff's employment.

### (c) Whether the Defendant's Legitimate Nondiscriminatory Reason is Pretextual

The plaintiff claims that the defendant's proffered legitimate nondiscriminatory business reason for the adverse employment actions taken against the plaintiff is pretextual. The plaintiff argues that VDO's treatment of her was unusual and unique. The plaintiff claims that her Phase III period was extended for ninety days after her return to work from disability leave, while other employees' periods were extended only for the amount of time during which the respective employee was on leave. While VDO points out that it had placed another VDO employee on "special probation," the plaintiff rejoins that the employee in question had been terminated and rehired and that all new employees are placed on probation for an initial ninety-day period. The plaintiff claims also that her attendance record was "similar" to the records of other VDO employees who were not terminated.[14]

■ The court believes that the evidence suggests the existence of significant disputes of the material facts relevant to this issue. Again, VDO has narrowed the scope of its analysis to focus upon its legitimate reasons for the plaintiff's *termination*. The court however, has examined VDO's proffered legitimate reasons for the other adverse employment actions taken against the plaintiff, and the court is compelled to conclude that the summary judgment on this issue in favor of VDO would be improper. The replacement of the plaintiff into Phase I after her near completion of Phase II and the placement of the plaintiff into so-called "special probation" raise genuine issues of material fact on the question of whether VDO took those measures based solely upon the plaintiff's history of absenteeism. It is conceivable to this court that a reasonable jury could

conclude that VDO's supervisory employee departed from established policy to "craft" unique disciplinary measures applicable only to the plaintiff as a method of compelling the plaintiff to acquiesce to his demands. With the myriad of permissible inferences to be drawn from the evidence, summary judgment on this claim cannot issue.

### B. Count II—Battery

The plaintiff alleges that Nies actually and intentionally touched her against her will and that such contact was offensive. The plaintiff alleges further that the actions of Nies are imputed to VDO. Consequently, the plaintiff alleges that both defendants committed the common-law tort of battery.

The plaintiff alleges at least three incidents of battery. The defendants argue that two of these allegations are time-barred by the Virginia statute of limitations. In Virginia, "every action for personal injuries, whatever the theory of recovery, ... shall be brought within two years after the cause of action accrues." Va.Code Ann. § 8.01–243(A) (Michie 1992); *see also Mahony v. Becker*, 246 Va. 209, 435 S.E.2d 139, 140 (1993); *Luddeke v. Amana Refrigeration, Inc.*, 239 Va. 203, 387 S.E.2d 502, 504 (1990). Generally, "the cause of action shall be deemed to accrue and the prescribed limitation period shall begin to run from the date the injury is sustained in the case of injury to the person." Va.Code Ann. § 8.01–230; *Mahony*, 435 S.E.2d at 141. Clearly, the plaintiff may not rely upon these two alleged incidents to succeed on her claim of battery because the allegations are time-barred.

However, the plaintiff alleges that a third incident of battery occurred in December 1992. The plaintiff's version of this incident is corroborated by the testimony of another VDO employee. In his deposition, this VDO employee testified that he saw Nies touch the plaintiff and that he saw the plaintiff move away from Nies' hand. The defendants claim that such touching is casual, incidental, and not offensive as a matter of law.

---

14. The court notes that the plaintiff relies upon testimony concerning these employees' attendance records and does not submit exhibits in the form of attendance records. While certain testi- mony of these deponents may not be admissible at trial, business attendance records should be admissible.

In *Crosswhite v. Barnes*, 139 Va. 471, 124 S.E. 242, 244 (1924), the court observed that "[t]he law is so jealous of the sanctity of the person that the slightest touching of another, or of his clothes, or cane, or anything else attached to his person, or if done in a rude or insolent, or angry manner, constitutes a battery for which the law affords redress." Frequently, whether touching constitutes a battery will depend upon the intent of the actor. *See Lynch v. Commonwealth*, 131 Va. 762, 109 S.E. 427 (1921). In *Lynch*, the defendant stated to the victim, "Say, Mrs. Martin, I want to kiss a white woman. I want to see what it is like to kiss a white woman." *Id.* The victim responded, "No, Sir." *Id.* Thereafter, the defendant *placed his hand upon the victim's shoulder* and stated, "I didn't mean to insult you." *Id.* (emphasis added). The *Lynch* Court concluded that a jury could find that such touching constituted a battery. The *Lynch* Court cited *Goodrum v. State*, 60 Ga. 509 (1878), a case in which a Georgia court held that a man's placing his arm around the neck of another man's wife without any innocent excuse constituted an assault and battery.

The defendants cite only to *Surrency v. Harbison*, 489 So.2d 1097 (Ala.1986). In *Surrency*, the court stated that merely to touch another to attract attention or to push against another to make way through a crowd does not constitute a battery. *Id.* at 1104 (quoting *Singer Sewing Machine Co. v. Methvin*, 184 Ala. 554, 63 So. 997, 1000 (1913)). However, the defendants fail to read the next paragraph of *Surrency*: "Furthermore, when there is conflicting evidence, as here, the issue of whether there was, in fact, an assault and battery at all is a question for the jury." *Id.*

In the instant action, whether the December 1992 action of Nies constitutes a battery is a question for the jury. Taking all inferences in favor of the plaintiff, a jury could conclude that Nies' behavior constitute more than incidental contact comparable to attracting attention or pushing one's way through a crowd. Consequently, the court overrules the defendant Nies' motion for summary judgment on Count II.

Likewise, the court overrules the defendant VDO's motion for summary judgment on Count II, pursuant to the Virginia common-law doctrine of respondeat superior. "A principal is liable for an assault [and battery] committed by his agent in discharging the command of the principal." 2A *Michie's Jurisprudence: Assault and Battery* § 18, at 226 (1993). "In determining whether an agent's tortious act is imputed to the principal, the doctrine's primary focus is on whether the activity that gave rise to the tortious act was within or without the agent's scope of employment." *CBS, Inc. v. BellSouth Servs. Inc.*, 249 Va. 39, 453 S.E.2d 261, 266 (1995). *See also* 2A *Michie's Jurisprudence, supra*, at 226–27 ("[A] master cannot be held liable for a servant's assault [and battery] on a third person unless the assault was committed either by direction of the master, or *in the performance by the servant of duties within the scope of his employment, or in the course and connected with such employment*.") (emphasis added). "An employer may be liable for an employee's acts even if the employee's motive is to benefit the employee, to 'advance his self-interest, rather than the interest of [his employer].'" *Martin*, 48 F.3d at 1351 (quoting *BellSouth*, 453 S.E.2d at 266). "'[T]he test of the liability of the master for the tortious act of the servant, is not whether *the tortious act itself* is a transaction within the ordinary course of the business of the master, or within the scope of the servant's authority, but whether *the service itself, in which the tortious act was done,* was within the ordinary course of such business or within the scope of such authority.'" *BellSouth*, 453 S.E.2d at 265 (quoting *Davis v. Merrill*, 133 Va. 69, 112 S.E. 628, 631 (1922)) (emphasis in original).

VDO relies upon *Jamison v. Wiley*, 14 F.3d 222, 237 (4th Cir.1994), in which the court noted that "under Virginia law, an act is within the scope of employment only if it is 'fairly and naturally incident to [the master's] business, ... done while the servant was engaged upon the master's business and ... done, although mistakenly or ill-advisedly, with a view to further the master's interests, or from some impulse or emotion which naturally grew out of or was incident to the

attempt to perform the master's business, and did not arise wholly from some external, independent, and personal motive on the part of the servant to do the act upon his own account.'" *Id.* (quoting *Sayles v. Piccadilly Cafeterias, Inc.,* 242 Va. 328, 410 S.E.2d 632, 634 (1991)). In *Jamison,* the court concluded that a district court did not err in determining that a supervisor's retaliatory actions against an employee were wholly without the scope of employment where the supervisor's motives were linked to the employee's rejecting the supervisor's sexual advances.

 In the instant case, a jury could find that Nies was acting in the scope of his employment when committing the alleged harassing conduct. A jury could find that Nies was acting within the scope of his authority by ordering that the plaintiff re-enter Phase I of the corrective program or by ordering her termination in response to her rejecting his requests. On the other hand, a jury could find that Nies' motives were without the scope of his employment and arose "wholly from some external, independent, and personal motive." "It is the employer's burden to show that the employee 'was not acting within the scope of his authority when he committed the acts complained of, and, if the evidence leaves the question in doubt, it becomes an issue for determination by a jury.'" *Martin,* 48 F.3d at 1351 (quoting *BellSouth,* 453 S.E.2d at 265). The court believes that this issue is one for the jury. *Tri–State Coach Corp. v. Walsh,* 188 Va. 299, 49 S.E.2d 363, 367 (1948) ("Often, [in cases involving the doctrine of respondeat superior], the inferences to be drawn from the facts proved are within the province of a jury.").

### C. Count III—Wrongful Discharge

#### 1. FMLA

The so-called Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§ 2601–2654 (1995), provides eligible employees of a covered employer the right to take unpaid leave for a period of up to twelve workweeks in any twelve month period because, *inter alia,* the employee's own serious health con-

dition makes the employee unable to do his or her job. *See* 29 C.F.R. § 825.100 (1994). Pursuant to § 2617, an employee may bring a civil action in any federal court of competent jurisdiction for damages equal to any wages, salary, employment benefits, or other compensation denied or lost to the employee as a result of a violation of the FMLA. In the instant action, the plaintiff claims that VDO violated the FMLA by terminating her employment due to her absence from work on March 2, 1994, where the absence was covered pursuant to provisions of the FMLA and where the plaintiff provided VDO with an FMLA Certification Form. In her memoranda submitted to the court, the plaintiff alleges that the defendant violated also the following provisions of the FMLA: 29 C.F.R. § 825.301 (failing to specify her rights under the FMLA in the company employee handbook); 29 C.F.R. § 825.301(c) (failing to specify expectations of employer and obligations of employee after the employee has provided the employer with notice for the need for FMLA leave); 29 C.F.R. § 825.305(a) (failing to provide the employee with fifteen days to provide medical certification or to cure any alleged deficiency); 29 C.F.R. § 825.307 (violating the provision by requesting information from the Department of Labor); 29 C.F.R. § 825.500(c)(7) (failing to keep records of any dispute between the employee and the employer concerning the designation of FMLA leave). The plaintiff claims that VDO has admitted that it violated the plaintiff's rights under sections 825.307, 305(a), 301(c), 825.500(c)(7).[15]

The plaintiff's evidence indicates that the plaintiff was suffering from "sinobronchitis." (*See* Hott FMLA Certification Form, Defendant's Exhibit 23). VDO argues that sinobronchitis does not constitute a "serious health condition" pursuant to FMLA. *See* 29 C.F.R. § 825.114. VDO relies upon its own investigation which included a telephone call to the United States Department of Labor ("DOL"). VDO claims that the VDO employee who made the telephone call testified that a representative from the DOL told her that the plaintiff's absence for sinobronchitis was

---

15. The court does not find such an "admission." The court finds, however, that the plaintiff failed to plead violations of these enumerated regulations.

not covered by the FMLA. The plaintiff rejoins that neither the DOL nor the employer makes the determination whether a condition constitutes a "serious health condition;" rather it is the physician who makes such a determination.

Section 825.114 of the Code of Federal Regulations provides the only enunciation of a "serious health condition." Section 825.114(c) provides, in relevant part, that "[t]reatment for allergies or stress . . . [is a] serious health condition[ ] if all the conditions of the regulation are met." Pursuant to § 825.114(a), a serious health condition is an illness that involves any period of incapacity in connection with or consequent to impatient care, or any period of incapacity requiring absence from work of more than three calendar days that also involves continuing treatment, or continuing treatment for a chronic health condition that is so serious that, if not treated, would likely result in a period of incapacity of more than three calendar days. Section 825.114(d), in relevant part, provides that: "The scope of 'serious health condition' is further clarified by the requirements of the Act that the health care provider may be required to certify: . . . that 'the employee is unable to perform the functions of the position of the employee. . . .'" (Citing § 825.115). In the instant action, the Certification Form provided that the condition would likely last for seven to ten days and that the plaintiff was able to perform the functions of her position. This suggests that sinobronchitis does not constitute a "serious health condition." *See, e.g., Seidle v. Provident Mutual Life Ins. Co.,* 871 F.Supp. 238 (E.D.Pa.1994) (a child's ear infection did not constitute a "serious health condition" where the treatment consisted of one twenty-minute doctor's examination and a ten-day regimen of antibiotics and where the child was not absent from day-care for more than three days); *Oswalt v. Sara Lee Corp.,* 889 F.Supp. 253 (N.D.Miss.1995) (food poisoning did not constitute a "serious health condition"), *aff'd,* 74 F.3d 91 (5th Cir.1996).

Alternatively, the plaintiff could possibly prevail if she proved that sinobronchitis is an illness that, if not treated, would likely result in a period of incapacity of more than three days. The parties present no evidence on this issue. The plaintiff argues merely that she had suffered from sinusitis bronchitis for a considerable period of time and had undergone continuing treatment for this condition. Accordingly, the court adopts the Magistrate Judge's recommendation that the court grant the defendant's Motion for Summary Judgment as to Count III on the claim of a violation of the FMLA.

*2. Sexual Harassment.*

The plaintiff argues that she was wrongfully discharged for her refusal to comply with requests for sexual favors and in retaliation for her complaints to Human Resources about the sexual harassment. The doctrine of "employment-at-will" is well-established pursuant to Virginia law:

> Virginia adheres to the common-law rule that when the intended duration of a contract for rendition of services cannot be determined by fair inference from the terms of the contract, then either party is ordinarily at liberty to terminate the contract at will, upon giving the other party reasonable notice.

*Miller v. SEVAMP, Inc.,* 234 Va. 462, 362 S.E.2d 915, 916–17 (1987); *Stonega Coal & Coke Co. v. Louisville & Nashville R.R. Co.,* 106 Va. 223, 55 S.E. 551, 552 (1906). In *Bowman v. State Bank of Keysville,* 229 Va. 534, 331 S.E.2d 797 (1985), the Virginia court recognized certain narrow exceptions to the employment-at-will doctrine—namely, an exception "limited to discharges which violate *public* policy, that is, the policy underlying existing law designed to protect the property rights, personal freedoms, health, safety, or welfare of the people in general." *SEVAMP,* 362 S.E.2d at 918 (emphasis in original). In *Lockhart v. Commonwealth Educ. Sys. Corp.,* 247 Va. 98, 439 S.E.2d 328, 331 (1994), the Virginia court acknowledged that the *Bowman* public policy exception includes terminations based upon, *inter alia,* gender discrimination. *Id.* at 332 ("We merely hold that the narrow exception to [the employment-at-will] doctrine, which we recognized in *Bowman,* includes instances where, as here, employees are terminated because of discrimination based upon gender or race.").

■ In the instant action, the plaintiff requests that this court expand the *Lockhart* court's recognition of the gender discrimination exception to encompass a claim of sexual harassment. The court cannot. Without affirmative guidance from either the Virginia legislature or the Virginia courts, this federal court is not inclined to expand Virginia law in such a fashion.

■ In a recent decision, the Virginia Circuit Court for the City of Martinsville declined to expand the *Lockhart* gender discrimination exception to encompass a claim of sexual harassment. *Stallings v. Leeds, et al.,* Case No. CL 95–171 (Jan. 18, 1996). In a letter opinion, Judge Charles M. Stone wrote:

It is my feeling that plaintiff is attempting to expand the sexual discrimination exception to Virginia's employment at will doctrine, as held in *Lockhart,* to encompass sexual harassment. Allegations of sexual harassment do not necessarily equate to sexual discrimination. Indeed, in some instances, the individual who claims sexual harassment may be treated more favorably than others similarly situated. Had the legislature intended to include sexual harassment under [Va.Code Ann.] § 2.1–715(1), it would have done so. It is quite reasonable that the legislature intended to avoid becoming mired in what is and what is not sexual harassment. This possibility is enhanced by the language in § 65.2–301 which, in a workmen's compensation context, specifically states that "Nothing in this title shall create a remedy for sexual harassment nor shall this title bar any action at law, that might otherwise exist, by an employee who is sexually harassed." The exceptions to the employment at will doctrine have in the past been made on a case by case basis by the Supreme Court. I see no compelling reason to expand the *Lockhart* doctrine to include claims for sexual harassment.

*Id.,* Letter Op. at * 2. This court is influenced generally by Judge Stone's analysis.

It has long been the belief of this court that pronouncements of a state's public policy should emanate from that state's legislature or its courts, not the federal courts located within that state. Consequently, the court finds, as a matter of law, that the plaintiff has failed to state a cause of action for wrongful discharge based upon a claim of sexual harassment, pursuant to extant Virginia law.

### D. Count IV—Negligent Hiring, Retention and Supervision

#### 1. Negligent Hiring

■ "Virginia has long recognized the tort of negligent hiring." *J. v. Victory Tabernacle Baptist Church,* 236 Va. 206, 372 S.E.2d 391 (1988) (citing *Weston's Adm'x v. St. Vincent, Etc.,* 131 Va. 587, 107 S.E. 785 (1921)). In *Victory Baptist,* the Virginia court observed that " 'negligent hiring is a doctrine of primary liability; the employer is principally liable for negligently placing an unfit person in an employment situation involving an unreasonable risk of harm to others.' " *Id.* at 394 (quoting Note, *Minnesota Developments—Employer Liability for the Criminal Acts of Employees Under Negligent Hiring Theory: Ponticas v. K.M.S. Investments,* 68 Minn.L.Rev. 1303, 1306–07 (1984)); *see also Simmons v. Baltimore Orioles,* 712 F.Supp. 79, 81 (W.D.Va.1989) ("The test is whether the employer has negligently placed 'an unfit person' in an employment situation involving an unreasonable risk of harm to others."). In *Davis,* the court concluded that a company was negligent in hiring a railroad worker who had been fired from a prior job where there was "no inquiry of any one concerning [the worker's] past record, habits, or general fitness for the position." *Davis,* 112 S.E. at 631. Virginia law is very sparse on this issue.[16]

■ In the instant action, the court rejects the plaintiff's claim of negligent hiring. In *Davis,* the court concluded that if the employer had inquired into the employee's work history, then the employer would not

---

**16.** The issue in *Victory Baptist* was whether the plaintiff had stated a cause of action against a church which had failed to warn her that its employee had been convicted of aggravated sexual assault on a young girl prior to his hiring. The Virginia court declined to decide the issue because neither party had cited authority therefor.

have likely hired the employee. In *Victory Baptist*, the history of the employee was directly related to the circumstances surrounding the allegation. In the instant action, however, Nies was employed by VDO before his transfer to the Winchester facility. The plaintiff does not present any evidence that Nies was alleged to have engaged in sexually harassing behavior in any prior job. *See Simmons*, 712 F.Supp. at 81 ("[Negligent hiring] conditions liability on the employer's knowledge that the employee's past actions strongly suggest that he is unfit for a job which involves an unreasonable risk to others.") The plaintiff has not shown that there existed facts in Nies' employment history that would have deterred VDO from hiring him. The plaintiff merely relies upon the fact that Nies was not trained in the United States and was not familiar with the United States' labor laws and that VDO should not have placed Nies in a supervisory position. This argument is weak. The case law suggests that there would still have to be some evidence in Nies' background that would have deterred a reasonable employer from placing Nies in a supervisory position. Given the absence of such evidence, the court will grant the defendant's motion for summary judgment on the claim of negligent hiring.

### 2. Negligent Retention

■ In *Paroline v. Unisys Corp.*, 879 F.2d 100, 112 (4th Cir.1989), *superseded en banc on other grounds*, 900 F.2d 27 (4th Cir.1990), the court noted that "[s]ince Virginia recognizes the tort of negligent hiring, logic suggests that it would also recognize a cause of action based on an employer's negligent retention of an employee who displays dangerous tendencies after his hiring." However, the court noted also that it is unclear whether the principles of *Victory Baptist* would encompass a claim of negligent retention. Given the lack of direction from the Virginia legislature and courts, the court believes that the plaintiff's claim based upon negligent retention must fail.

### 3. Negligent Supervision

This issue will not long detain the court. In *Spencer*, the court noted:

To reject [the plaintiff's] contention that there exists in Virginia a cause of action against [his employer] for its negligent supervision ... [the court need] look no further than the Supreme Court of Virginia's decision in *Chesapeake and Potomac Telephone Co. of Virginia v. Dowdy*, 235 Va. 55, 365 S.E.2d 751 (1988). In *Dowdy*, the Virginia court framed the issue as whether "the common law of Virginia recognizes a tort of negligent supervision of an employee by the employer and its managerial personnel." *Id.* 365 S.E.2d at 751. In answering the question in the negative, the court reasoned that there can be no negligence unless there has been the breach of a legal duty and "[i]n Virginia, there is no duty of reasonable care imposed upon an employer in the supervision of its employees under these circumstances...." *Id.* 365 S.E.2d at 752–53.

*Spencer*, 894 F.2d at 656–57. With such a clear directive, the court must grant the defendant's motion for summary judgment as to the claim of negligent supervision.

### III.

For the reasons stated above, the defendants' motion for summary judgment as to Counts I and II shall be OVERRULED, and the defendant VDO's motion for summary judgment as to Counts III and IV shall be GRANTED. An appropriate order issued on March 8, 1996.

### ORDER of March 8, 1996 *

1. The Report and Recommendation of the Honorable B. Waugh Crigler, Magistrate Judge, United States District Court for the Western District of Virginia, shall be, and it hereby is, ADOPTED inasmuch as the Report recommends that the court overrule the defendants' motions for summary judgment as to Counts I and II and that the court grant the defendant VDO's motion for summary judgment as to Counts III and IV.

* Editor's Note: Although a March 8, 1996 Memorandum Opinion was withdrawn, this Order remained in effect.

2. The court declines to adopt the Magistrate Judge's recommendation that the court restrict its consideration of Count III to the claim of wrongful discharge based upon a violation of the so-called "Family Medical Leave Act." Consequently, the court considered the plaintiff's claim of wrongful discharge based upon the ground of sexual harassment.

3. The civil action, 94–00064–H, is referred back to the Magistrate Judge to set a date for trial and to address any pre-trial matter as he deems appropriate.